EVEN-HEAT COMPANY *v.* WADE ELECTRIC
PRODUCTS COMPANY.

1. Negligence—Breaking of · Die—Contributory Negligence—
   Preponderance of Evidence.
   Finding of trial court that plaintiff was, in part, at fault in
   the breaking of a cam die for making flatiron tops, in that
   design of die was faulty, *held,* against the clear preponderance
   of the evidence, especially where the court dismissed action
   as to codefendant which had made the die, on the ground
   that it had been made in a workmanlike manner.

2. Same—Breaking of Die—Evidence.
   Finding that defendant press operator was responsible for the
   breaking of a cam die which broke while improperly secured
   in defendant's press as it was being operated *held,* not against
   the clear preponderance of the evidence.

3. Trover and Conversion—Partial Deprivation.
   Conversion does not necessarily imply a complete and absolute dep-
   rivation of property as there may be a deprivation which
   is only partial or temporary.

4. Same—Conversion of Dies—Evidence—Liens.
   Defendant manufacturer who broke 1 of plaintiff's 3 dies while
   making parts for electric flatirons and refused to turn over
   any of the dies upon .request *held,* to have effected a con-
   version of all of such dies, defendant not having a lien on
   the dies since it had done no work on them but used them only
   in production and claimed 'right to retain them only until
   payment of its bill.

5. Same—Withholding of Dies—Damages—Evidence.
   No damages are awarded plaintiff for the wrongful withholding
   of 2 of its 3 dies by defendant, on condition of their return

References for Points in Headnotes
[3, 4] 53 Am Jur, Trover and Conversion § 44.
[3, 4] Mere detention of or failure to deliver chattels after demand
   as conversion. 61 ALR 621; 129 ALR 638.
[5] 53 Am Jur, Trover and Conversion § 183.
[6] 53 Am Jur, Trover and Conversion § 116.

to plaintiff, where there was no showing of the loss occasioned to plaintiff by the withholding of such 2 dies.

6. SAME—MITIGATION OF DAMAGES—TENDER OF RETURN OF UNREPAIRED DIE.

Defendant's belated offer to return cam die in its unrepaired state does not mitigate plaintiff owner's damage, where die was broken as a result of defendant's negligence, its repair would cost nearly as much as a new die and defendant wrongfully converted the die by withholding it along with 2 others until its bill had been paid, an amount which plaintiff had paid to recondition the die being disregarded, and value set at original cost of the die.

7. SET-OFF AND RECOUPMENT—TROVER AND CONVERSION—CONSENT TO SUBSTITUTION OF CONTRACTOR.

Trial court's implied finding that plaintiff had agreed to the substitution of defendant for latter's assignor in the manufacture of flatiron parts *held*, against the clear preponderance of evidence, where it is shown plaintiff never ordered or authorized the work done by defendant nor knew it was doing any production until after the breakdown of a vital die, hence defendant's bill for setting up press for the work done and for sample irons was not allowable as an item of recoupment against plaintiff's judgment for conversion of dies.

Appeal from St. Joseph; Arch (Charles O.), J., presiding. Submitted January 9, 1953. (Docket No. 53, Calendar No. 45,691.) Decided June 8, 1953.

Action by Even-Heat Company, a Michigan corporation, against Wade Electric Products Company, a corporation, and another for damages to, and for conversion of, dies. Defendant Wade Electric Products Company claims recoupment in its answer. Judgment for plaintiff in smaller amount. Plaintiff appeals. Reversed and remanded for entry of judgment for plaintiff.

*Dickinson, Wright, Davis, McKean & Cudlip* (*Glenn D. Curtis,* of counsel), for plaintiff.

*Raymond H. Dresser,* for defendant.

REID, J. Plaintiff sued defendant for conversion of 3 dies claimed to be of the total value of $5,129. The trial was without jury. The court found no conversion, but allowed plaintiff $453.78, as the remainder after deducting $296.22 [$286.22?] as owed by plaintiff for production, from $750 as owed by defendant for negligence in breaking one of plaintiff's dies. Plaintiff appeals.

Precision Tool & Die Company of Bronson, Michigan, was joined as a defendant, but was found not liable to plaintiff, and was dismissed by the trial court. No appeal from that order of the lower court has been taken, and that defendant is not to be considered as included in any reference to the "defendant" herein.

The 3 dies referred to were for use in producing tops for electric flatirons and were made by Seyburn Tool Company of Detroit. Plaintiff contracted with Truman E. St. Clair of Bronson to manufacture tops for electric irons for plaintiff, and plaintiff furnished the dies for such manufacturing. St. Clair accepted the dies, but discovered that his press was not large enough for the production and arranged with Wade Electric Products Company, defendant, to make the actual production. Plaintiff claims this arrangement with defendant Wade was without plaintiff's consent at the time, and without plaintiff's knowledge until after the breakdown hereinafter referred to, but defendant claims it was with plaintiff's knowledge and consent.

Samples were run and it was discovered that the dies were deficient; plaintiff represented by Mr. Curtis, its president, was informed by St. Clair of the defective condition. Mr. Curtis (apparently on or about March 1, 1948) authorized Mr. Rissman, representing Precision Tool & Die Company, to change the dies to render them proper for production, which Precision Company agreed to do, and did work on

all 3 dies, charging $575 for the work on the cam die (which was afterwards broken), $206 for changes on the first form die and $323 for changes on the second form die, which repair items were all paid for by plaintiff.

During production by defendant, the cam die was broken and production ceased, with no offer by St. Clair or by defendant, to resume under any condition. Afterwards St. Clair assigned to defendant, not expressly his account but, "all my right title and interest which is in excess of $650, in and to 3 dies," *i.e.,* the 3 dies in question, the assignment being dated August 30, 1948, about which time St. Clair sold out and went to California. It seems probable that the parties assumed that St. Clair had a lien on the dies for $650 and intended that the assignment should cover the account as secured by the lien.

Exhibits A and B attached to plaintiff's declaration are admitted by defendant to have been written as indicated, and are as follows:

### Exhibit A

"December 7, 1948

"The Wade Electric Company
"Sturgis, Michigan
"Attention: Mr. Jap Long

*"Gentlemen:*

"Many months ago we arranged with Mr. St. Clair of Bronson, Michigan to make a certain number of stampings for the Even-Heat Company of which I am president. Certain dies were delivered to him for this purpose. He represented to us that he had the necessary facilities in his shop to do the work.

"Sometime later, Mr. St. Clair came into my office and stated that he had taken 1 of the dies to your shop in Sturgis to have some of the work done there and that you had broken the die beyond repair. There seems to be some dispute as to whether the die

broke because of your improper procedure or because of improper construction of the die. I have called your plant several times and made 2 trips there to discuss the matter with you, but you have never been in and have never returned my calls or been in any manner cooperative in trying to get this matter straightened out. This die was finished in Bronson by the Precision Tool & Die Company and Mr. Rissman, owner of that company, guaranteed that it would work and make good stampings. Therefore, liability for this breakage must be either on your company or the Precision Tool & Die Company.

"Mr. St. Clair did not complete the work he was supposed to do and I understand he has left Bronson without delivering any stampings to us. Whether or not he made any at all I don't know, but in any event he did not perform his contract and if he performed any part, he has so delayed it that he has caused us a great deal of monetary loss for which we intend to hold him liable. We therefore, consider that we owe him nothing and that probably he owes us money.

"I have been able to get no response whatsoever from you even to the extent of a quotation on making a new die even though we paid for it in the event that Mr. Rissman's company was found to be responsible for the loss. We made arrangements with Mr. Carroll McClish of the Southern Michigan Machine Tool Co. of Bronson, Michigan to pick up the dies at your plant. He stated that you claim there was $106.23 owing to you for work you had done for Mr. St. Clair. While we did not employ you to do anything and, therefore, owe you nothing on our account, and did not authorize Mr. St. Clair to employ you to do any work and are therefore, not responsible for his indebtedness to you, we nevertheless told Mr. McClish to pay you the $106.23 without prejudice to our possible claim against you for the breaking of the die. He telephoned me yesterday and said that you now claim there was $286.23 owing to you and that Mr. St. Clair claimed that we owed him $363.77 for work that he

had done for us and had given you an assignment of his claim and that, therefore, you would not deliver any of our dies or parts to him until the $286.23 and the $363.77 had been paid.

"This action on your part is an unlawful conversion of our property as you are wrongly withholding possession of it and this is to notify you that if you do not deliver all of our dies, including the broken one, to Mr. McClish we are going to hold you responsible for the value of all of these dies and any other property of ours that you refuse to deliver to him. We will also probably claim damages for the delay that you are causing us by your unwarranted refusal to deliver our property to us.

"Very truly yours,<br>"Glenn D. Curtis

"GDC :sh"

### Exhibit B

"December 15, 1948

"Mr. Glenn D. Curtis
"Dickinson, Wright, Davis, McKean & Cudlip
"National Bank Bldg.
"Detroit 26, Michigan

*"Dear Mr. Curtis:*

"Your letter of December 7, addressed to our Mr. Long, has been referred to our attorney, who informs us that he believes we should not release the dies and work in process until we receive payment. We took this work in good faith and naturally intend to be paid for it. We have of course no knowledge of your relationship with Mr. St. Clair, and that matter is one for you and he to determine.

"Very truly yours,<br>"Wade Electric Products Co.<br>"Jos. L. Whitmer /s/<br>"Jos. L. Whitmer, Controller

"JLW/jj"

Mr. Jasper Long, production manager for defendant, interested in defeating or minimizing recovery

by plaintiff for conversion, testified that the die that broke, "was so poorly designed it was useless; I don't know why anybody would ever receive such a die in the beginning * * * bound to break." But on cross-examination, he testified that he never notified Mr. Curtis that these dies were defective or in any way poorly designed, and further testified on examination by the court:

"*Q.* Did you complain to Mr. Rissman about these pins here not being long enough—I believe you said only three-eighths inch in diameter?

"*A.* I am talking about stock pin holding the slide. I would say most of my conversation was with Mr. St. Clair, not Mr. Rissman, because he was paying for the repairs, or someone was, not us, and it was his job, so consequently my conversation was all with Mr. St. Clair.

"*Q.* You did not complain to Mr. Rissman about it?

"*A.* No, I cannot recall that I did."

Defendant took the dies after Rissman had worked on them, and undertook production. Mr. Rissman testified the dies "were in good working order and they made good parts" after he repaired or refashioned them, and that the cam die broke because it "had either loosened in the press or something, and slid over. * * * The die pin mark was in the hardened die section * * * [which] could not have happened unless it became loose."

Mr. Carroll McClish, operator of a tool and production shop in Bronson which has a contract with plaintiff to repair and build new dies that will manufacture plaintiff's flatiron, testified that the cam die came loose and slipped, that the damage was caused by this loosening of the die rather than any defect in the die. St. Clair, sworn as a witness for *defendant,* testified:

"I said the die had been broken, * * * bolts had come loose, or something and moved it over."

Defendant's witness Killian testified:

"It is my opinion that this slide did not position properly and when the cam struck it, it moved the whole lower die-set over. The guides were not doing their stuff at all. If the dies go down crooked it is going to break."

A defect in the die which had nothing to do with the breaking of it, was that the die did not cut the scrap completely through, the metal hung there with no place to go, which defect slowed up the production; allowance was made by awarding St. Clair a higher price for production.

The court found, as to Precision Tool & Die Company (represented in the operations in question by Mr. Rissman): "They did what they were hired to do and they did it in a workmanlike manner, they received their pay for it, and as far as they are concerned there is no liability whatsoever on their part;" and the court dismissed that defendant. Rissman was hired to put the die into a good, workable condition. It is scarcely consistent to say that Rissman did the work in a workmanlike manner and still to say that the breaking of the cam die was, in part, the fault of plaintiff.

The trial judge found plaintiff responsible jointly with defendant for the breaking of the cam die, which finding is, as to plaintiff, against the clear preponderance of evidence, and we reverse that part of the finding. The defendant was operating the press when the cam die broke, and according to the clearly preponderating evidence, if the die had not been allowed to get loose and slip, the break would not have occurred. The finding that defendant was responsible for breaking the cam die is not against the clear preponderance of evidence and is affirmed.

Plaintiff offered to pay $106.23 as the claim that defendant held against the dies on condition of repossession and later offered "$280 and some dollars," but was refused repossession of the dies. This appears from the letter of December 7, 1948 by plaintiff to defendant, and is undenied in the answering letter of December 15, 1948, exhibit B. The refusal continued until tender back in defendant's answer filed August 9, 1949.

In *Belcher* v. *Ranney,* 211 Mich 438, 443, we quote with approval from a former decision of this Court, as follows:

"In *Daggett* v. *Davis,* 53 Mich 35 (51 Am Rep 91), Chief Justice Cooley, speaking for the Court, said:

" 'But conversion does not necessarily imply a complete and absolute deprivation of property; there may be a deprivation which is only partial or temporary, and where the property of the plaintiff remains in or is restored to him. * * * An illustration is where one hires a horse for one use and puts it to another, subsequently returning it to the owner. * * * The difference between such a case and one in which the property is wholly made away with, is one affecting the damages only; the damages go to the whole value of the property in the one case, and are commonly less in the other.' "

See cases cited in the *Belcher Case,* including 6 Michigan cases.

No offer was made by defendant to repair the cam die or replace it. Nowhere in its pleadings nor in testimony offered or given, does defendant claim or show any offer to continue production, after the cam die was broken, nor to repair it. Defendant's claim of right to retention of the dies, was only till payment of its bill and on that condition and for that purpose only. Defendant had done no work on the dies, but only used them in production. Defendant had no lien on the dies.

Possession of the 3 dies was wrongfully withheld. The trial court's finding that there was no conversion by defendant, of the 3 dies, is against the clear weight of evidence, and is reversed.   There was no showing of the loss occasioned to plaintiff by reason of the withholding of the first form die and second form die, and no damages are awarded for the withholding of those 2 dies, on condition however of their actual return to plaintiff.   Defendant's offer to return the cam die in its unrepaired condition, with the likelihood that its repair will cost the full value of the die or nearly so, even if found reparable, does not operate to mitigate plaintiff's damages for the conversion of the cam die.   Defendant's tool supervisor and witness Mr. Killian testified:

"It possibly could be repaired, but the cost of it would be so high that a new die would be more practical."

The original cost of the cam die was $2,025, for which it was delivered to and paid for by plaintiff in a supposedly good working condition.   We disregard the additional cost of reconditioning the die done by Rissman and consider its value when return was refused, as $2,025.

Defendant claims it should be allowed $286.22. This bill is for setting the press and for "flatiron covers processed through 1st and 2nd draw, not completed due to broken die," and for sample irons.

Curtis testified clearly and emphatically that he (acting for plaintiff) did not know of or agree to the substitution of defendant for St. Clair in the production and so stated in plaintiff's letter to defendant of December 7, 1948, which statement was undenied in defendant's answering letter of December 15th. When the defective condition of the dies was discovered, no officer or agent of defendant is shown to have been called into the consultation with Curtis over

remedying the dies; defendant's witnesses Whitmer and Long do not contradict Curtis' statement, and Long, production manager for defendant, in his testimony hereinbefore cited, seems not to have known of plaintiff in the matter of paying for remedying the dies. The only witness who testified that plaintiff knew of and consented to the substitution, was St. Clair who could not say whether his conversation was with Curtis or with plaintiff's engineer, thus indicating that his recollection was indistinct and not reliable. There is no showing that plaintiff's engineer was authorized to consent to the substitution, or assumed such authority.

The court's implied finding that the substitution was agreed to by plaintiff is against the clear preponderance of evidence and is reversed. It is not shown that any of the parts made by defendant were ever completed ready for delivery. Plaintiff never ordered or authorized the work done by defendant nor knew of defendant doing any production until after the breakdown, and was not then obliged to accept the work in view of the shown negligence of defendant and because the agreement between plaintiff and St. Clair contained no mention of assignability. Defendant's bill for such parts, the setting up of its press for the work and for sample irons, is a matter between defendant and St. Clair or "St. Clair's company." Long testified: "It was his [St. Clair's] job."

Defendant's bill for $286.22 is disallowed. The judgment appealed from is reversed. The cause is remanded to the trial court with instruction to enter judgment for plaintiff for $2,025 with costs of both courts.

DETHMERS, C. J., and ADAMS, BUTZEL, CARR, BUSHNELL, SHARPE, and BOYLES, JJ., concurred.