# STATE OF MICHIGAN

# COURT OF APPEALS

HARD LUCK DISTRIBUTORS, L.L.C.,

        Plaintiff/Counter-Defendant-
        Appellee,

v

TEMPERANCE DISTILLING COMPANY,

        Defendant/Counter-Plaintiff-
        Appellant.

UNPUBLISHED
May 21, 2015

No. 319392
Macomb Circuit Court
LC No. 2012-002415-PD

Before: WILDER, P.J., and OWENS and M. J. KELLY, JJ.

PER CURIAM.

In this suit for conversion of warehoused inventory, defendant, Temperance Distilling Company, appeals by right the bench judgment in favor of plaintiff, Hard Luck Distributors, L.L.C. Because we conclude there were no errors warranting relief, we affirm.

## I. BASIC FACTS

In 2009, Hard Luck entered into a one-year contract for the production of flavored vodkas with Temperance. Hard Luck contracted with Temperance to manufacture and warehouse Hard Luck's vodkas because it did not have the necessary licenses. For the same reason, Temperance could only transfer the inventory to another state licensed facility. The state of Michigan collected the proceeds from the sale of the vodkas, sent them to Temperance, and it then paid Hard Luck its share.

Hard Luck originally negotiated its contract and dealt with Brian and Molly Pearson. Although the contract contained a provision for warehouse fees, Brian Pearson assured Christopher George, Hard Luck's chief operating officer, that there would be no charges if the amount of inventory was reasonable. After the one-year contract expired, the parties had concerns about quality and production. While addressing the concerns, George and Molly Pearson orally agreed to continue their business under the terms of the original contract.

In December 2010, Kenneth Ball was hired as Temperance's president, and was charged with the responsibility of making the company profitable. In February 2012, Temperance sent Hard Luck an invoice for $67,650 in warehouse fees that Hard Luck allegedly incurred in 2011. Hard Luck objected to the fees, noting that the invoice charged $150 per pallet even though the

-1-

contract provided a sliding scale of warehouse charges at a rate of $8 to $40 a pallet. Ball refused to negotiate any discount unless Hard Luck agreed to a new five-year contract. Additionally, Temperance stopped paying Hard Luck its portion of the proceeds from the sale of Hard Luck's inventory.

Hard Luck sued Temperance in May 2012. It sought, in relevant part, the return of its inventory, and damages for conversion, and unjust enrichment or quantum meruit. Temperance counter-sued for breach of contract and to collect on its account.

Hard Luck filed a motion asking the trial court to order the return of its inventory pending judgment; it alleged that it had asked Temperance to transfer the inventory to another state licensed warehouse, which charged $8 a pallet, but Temperance refused to release the inventory. Ball and Temperance's trial lawyer acknowledged that a transfer to another state licensed warehouse was permissible, but asserted that there was no reason for the transfer because the product was safe and continued to be dispensed in accordance with the parties' contract. After conducting an evidentiary hearing, the trial court granted the motion.

After conducting a bench trial, the trial court found that Temperance had converted Hard Luck's inventory and entered a judgment in Hard Luck's favor for $323,470. The trial court rejected Temperance's claim that Hard Luck breached its obligation to pay warehouse fees. Specifically, it found that Temperance failed to provide reasonable notice of its intent to begin charging the fees. In its decision, the trial court expressly found Ball's testimony to be disingenuous and found that Temperance took the actions that it did in order to "strong arm" Hard Luck into entering into new contract by "using fabricated past warehousing charges."

Temperance now appeals the judgment.

## II. CONVERSION

Temperance first argues the trial court erred when it determined that it converted Hard Luck's inventory. Specifically, it maintains that the evidence showed Hard Luck lacked the necessary federal permit to accept delivery of the inventory, any conversion was only temporary, and Temperance did not convert the inventory to its own use. This Court reviews a trial court's factual findings after a bench trial for clear error, but reviews de novo its application of the law. *Scholma v Ottawa Co Rd Comm*, 303 Mich App 12, 16; 840 NW2d 186 (2013).

"Conversion is any distinct act of dominion wrongfully exerted over another's personal property." *Trail Clinic, PC v Bloch*, 114 Mich App 700, 705; 319 NW2d 638 (1982). Conversion is an intentional tort, and therefore, a defense of "good faith" is unavailable. *Id.* at 705-706. Although an action for conversion will not lie unless the defendant's acts were willful, it can be committed unwittingly, such as where the defendant is unaware of the plaintiff's property interest. *Warren Tool Co v Stephenson*, 11 Mich App 274, 299; 161 NW2d 133 (1968). "There can be no conversion while the party is in the actual possession of and using the property for the purpose and in the place in which it was intended." *Felcher v McMillan*, 103 Mich 494, 500; 61 NW 791 (1895).

In addition to the common law claim for conversion, the Legislature has provided a statutory claim for conversion. See MCL 600.2919a. Under the statutory version, a plaintiff may recover three times his or her actual damages, plus costs and reasonable attorney fees if, in relevant part, the defendant converted the property and did so for his or her own use. MCL 600.2919a(1)(a). The statutory and common-law definitions of conversion are otherwise the same. *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 303 Mich App 441, 447; 844 NW2d 727 (2013).

Temperance argues that there was no conversion because it could not legally deliver the liquor inventory to Hard Luck because Hard Luck lacked a federal liquor permit as required under 27 USC 203. However, 27 USC 203 did not prohibit Temperance from transferring Hard Luck's inventory to a properly licensed warehouse facility. George indicated that Hard Luck did not seek the release of its inventory to it, but rather directed Temperance to transfer it to another state licensed warehouse facility. Nothing in the language of 27 USC 203 precludes transfer of inventory from one permitted or licensed facility to another permitted or licensed warehouse. Rather, 27 USC 203 characterizes actions with regard to the business of distilled spirits to be unlawful *unless* done pursuant to a basic permit.

At the evidentiary hearing on Hard Luck's motion to transfer the inventory pending judgment, Temperance's trial lawyer acknowledged that, although Hard Luck could not lawfully possess the inventory, Temperance could transfer the inventory to another bonded warehouse: the inventory "must remain with a warehouse, a bonded warehouse such as ours. Now we could go to another warehouse, it's true." Similarly, Ball testified at this hearing that the product could be transferred to another state-bonded, licensed warehouse. Moreover, the parties' agreement actually contemplated such a transfer:

> 10.4 Warehousing Charge. In the event that Customer fails to take delivery of the Beverage within the time specified, Packer shall have the right, at its option, to do one or both of the following on reasonable notice to Customer: (i) store the Beverage at Packer's warehouse at the rate(s) listed in the Warehousing Service Exhibit per pallet per month including any portion thereof, or (ii) transport the Beverage to a commercial warehouse for storage under terms and conditions established by the storage provider. The cost of storage shall be due and payable prior to any delivery of the Product to Customer. . . .

Consequently, the trial court did not err when it determined that Temperance could lawfully transfer the inventory to a properly licensed facility of Hard Luck's choice.

The evidence showed that Temperance presented Hard Luck with invoices for warehousing fees that George deemed excessive and without support in the parties' agreement. After the fee dispute arose, George attempted to negotiate the rate, but Ball refused to discuss any reduction before Hard Luck signed a new agreement. George testified that Hard Luck's representatives contacted other state licensed warehouses to move their product, but Temperance refused to transfer the inventory or release the proceeds from the sale of the existing inventory. By refusing to transfer the property on lawful demand, Temperance committed an act of wrongful dominion over the inventory. *Thoma v Tracy Motor Sales, Inc*, 360 Mich 434, 438; 104 NW2d 360 (1960); *Dunn v Bennett*, 303 Mich App 767, 778; 846 NW2d 75 (2014) (stating

-3-

that a person who is otherwise lawfully in possession of property may commit a conversion by refusing to surrender the property after a demand by another who has the right of possession). Similarly, by withholding the proceeds of the sale that it agreed to remit to Hard Luck, Temperance converted those funds. *Warren Tool*, 11 Mich App at 299.

Temperance also argues the trial court erred by concluding that conversion applies to even a temporary exercise of dominion over the inventory and that its exercise of dominion was not wrongful because the evidence showed that it continued to store the inventory, fulfill orders from distributors, and account for proceeds. As our Supreme Court has explained, conversion does not require a complete and absolute deprivation of property, and a partial or temporary deprivation is sufficient for purposes of conversion. *Even-Heat Co v Wade Electric Prods Co*, 336 Mich 564, 572; 58 NW2d 923 (1953). In addition, the evidence adduced at trial supported the conclusion that Temperance's exercise of dominion was wrongful.

George testified that Temperance engaged in harmful and retaliatory conduct designed to strong-arm Hard Luck into signing a new five-year agreement. Evidence showed that Hard Luck had $161,878.97 in inventory at Temperance's warehouse, but Temperance sought $120,000 in warehouse storage fees. It also refused to discuss or negotiate a reduction in the warehouse charges until Hard Luck agreed to sign a new five-year contract. After Hard Luck sued, Temperance went further and sent an invoice seeking warehouse fees dating back to 2010. According to George, Temperance effectively "paralyzed" Hard Luck's business by withholding the proceeds of the sales from the inventory and refusing to transfer the remaining inventory.

Whether Temperance had the right to retain possession of the inventory and assess the fees was a matter of dispute for the trial court. And the trial court rejected Ball's testimony as incredible. "Appellate courts must give regard to the trial court's superior ability to judge the credibility of the witnesses who appeared before it." *Rellinger v Bremmeyr*, 180 Mich App 661, 665; 448 NW2d 49 (1989). The trial court accepted George's testimony and found that Ball's testimony regarding annual, not monthly, billing of warehouse charges to be "disingenuous." The court even found that Temperance's decision to operate in a "business as usual manner" was motivated by an improper purpose:

> The Court finds Mr. Ball's testimony that warehouse charges were billed annually and not monthly to be disingenuous. It is clear to the Court that [Temperance] continued to operate with [Hard Luck] in a "business as usual" manner, and then attempted to strong arm [Hard Luck] into a long term agreement by using fabricated past warehousing charges as a tool to gain the upper hand and force a favorable agreement . . . .

In *Lund v Starz*, 355 Mich 497, 499-500; 94 NW2d 912 (1959), the plaintiffs' employees and their equipment were on the defendant's property pursuant to a valid lease, but the defendant refused to allow the plaintiffs' employees to remove the property. On appeal, our Supreme Court concluded that the trial court did not err when it determined that the defendant's acts amounted to conversion by refusing "to permit the removal of the equipment . . . in the attempt to force the payment to him of damages for alleged injury to his land." *Id*. at 502. Similarly, in the present case, Temperance refused to allow the transfer of the inventory in order to force the payment of outstanding warehouse charges. In the absence of evidence that Temperance had a

-4-

superior right to retain possession, its refusal to transfer the inventory constituted an act of wrongful dominion. See *Rohe Scientific Corp v National Bank of Detroit*, 133 Mich App 462, 350 NW2d 280 (1984) ("Liability for conversion does not arise if the actor is privileged to dispossess another of the chattel. . . . If defendant's right to possession was greater than that of plaintiff's, plaintiff could not maintain an action for conversion."), reversed on other grounds on rehearing, 135 Mich App 777.

We also reject Temperance's argument that there was no conversion because it did not convert Hard Luck's inventory to its "own use." In *Aroma Wines*, the plaintiff was in the business of importing and distributing fine wines, and the defendant ran a warehouse and transport business. The parties entered into a contract for the defendant to warehouse the wine in a temperature-controlled environment. When the plaintiff became delinquent in the monthly storage fees, the defendant asserted a lien on the wine, but continued to allow the plaintiff access to small portions of the wine. Eventually, the defendant denied the plaintiff any access to the wine, demanded that the account be paid in full, refused to allow release of the wine, and removed the wine from the temperature-controlled storage area. *Aroma Wines*, 303 Mich App 443. With regard to the plaintiff's claim for statutory conversion, the defendant argued that it did not convert the property to its "own use" because it did not drink or sell the wine. *Id.* at 444, 446-448. This Court rejected the contention that conversion of the wine required consumption or sale. Rather, the use of the wine as leverage as well as the act of moving the plaintiff's wine contrary to the terms of the contract could be considered a conversion for the defendant's "own use." *Id.* at 448-449.

The evidence in this case supports the conclusion that Temperance converted Hard Luck's inventory to its own use by refusing to transfer the inventory to another licensed warehouse in an attempt to leverage the payment of excessive warehousing storage fees and to "strong arm" Hard Luck into signing a new agreement.

## III. DAMAGES

Temperance next argues the trial court erred by awarding Hard Luck the actual inventory in addition to its value and other damages. A trial court's finding on the amount of damages is reviewed for clear error. *Chelsea Investment Group LLC v City of Chelsea*, 288 Mich App 239, 255; 792 NW2d 781 (2010). A finding is clearly erroneous when, "on review of the entire record, the reviewing court is left with the definite and firm conviction that a mistake has been made." *Peters v Gunnell, Inc*, 253 Mich App 211, 221-222; 655 NW2d 582 (2002). Damages that are based on speculation or conjecture are not recoverable, but an award is supported if there is a reasonable basis for the computation. *Chelsea Investment Group*, 288 Mich App at 255.

The trial court's opinion and order addressing damages states, in relevant part:

> [Hard Luck] has provided a valuation summary that the inventory wrongfully retained by [Temperance] had a value of $161,878.97. [Hard Luck] has also presented evidence that it sustained costs in the amount of $182,185.00. Given the unique nature of the inventory, and the credible evidence presented, the Court, as the finder of fact, is satisfied that damages in the amount of $324,000.00 are appropriate.

[8]   In assessing damages, the Court has considered the fact that [Temperance] has returned the inventory to [Hard Luck] (pursuant to the Court's order), the discretionary nature of treble damages, and the contractual provision allowing the prevailing party to be awarded reasonable costs and attorney fees.

The party asserting damages for conversion has the burden of proving the damages with reasonable certainty. *Central Transp, Inc v Fruehauf Corp*, 139 Mich App 536, 546; 362 NW2d 823 (1984). Typically, the "measure of damages for conversion is the market value at the time of conversion." *Embrey v Weissman*, 74 Mich App 138, 144; 253 NW2d 687 (1977). Market value is the measure for conversion "in the absence of testimony establishing a peculiar value in the goods to the owner." *Willis v Ed Hudson Towing, Inc*, 109 Mich App 344, 349-350; 311 NW2d 776 (1981).

MCL 600.2919a(1)(a) provides that damages resulting from another person's conversion of property to the other person's own use "may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees." Because of the use of the permissive term "may," "whether to award treble damages is a question for the trier of fact, and we cannot simply order treble damages upon a finding of conversion." *Aroma Wines*, 303 Mich App at 449-450.

Temperance argues that Hard Luck cannot be reimbursed for the inventory because it received the inventory, and therefore, even if a conversion occurred, "no direct damages existed." However, the measure of damages for conversion is the market value at the time of the conversion, *Willis*, 109 Mich App at 349-350, and may also include incidental damages such as lost profits, *Central Transport*, 139 Mich App at 546.

In the present case, Hard Luck presented evidence that it had $161,878.97 in inventory in Temperance's warehouse at the time the dispute arose regarding the warehouse storage fees and Temperance did not dispute that value. There was also testimony that Temperance continued to sell the inventory and wrongfully withheld the proceeds while Hard Luck's ability to continue operations effectively ceased. Temperance also did not question George regarding whether Hard Luck was able to sell the remaining inventory and whether it profited from the sales. There was also no testimony concerning the financial impact that the irrevocable letter of credit had on Hard Luck's business. The documentary evidence submitted by Hard Luck indicated that it was not able to place all the inventory in the marketplace; 2,188 cases of inventory were never shipped to Ferber, and 86 cases were incorrectly produced in old bottles. Moreover, Hard Luck had no obligation to mitigate its damages because of Temperance's continuous and wrongful conduct. *Willis*, 109 Mich App at 350-351.

The trial court stated that its finding on the total damages included the losses actually caused by the conversion of the inventory in addition to the damages incurred to prosecute the case, which were allowed under the contract, and took into consideration its discretion to treble the award. It also specifically stated that it considered the fact that the remaining inventory had been returned to Hard Luck in calculating the damages. Given that Hard Luck presented evidence that its damages exceed the final judgment and the trial court could have trebled the actual damages, we cannot conclude that the trial court clearly erred in calculating the damages.

-6-

Temperance also maintains that the trial court's factual findings were inadequate to support its award of damages. "Findings of fact are sufficient where it is manifest that the factfinder was aware of the factual issue, that he resolved it, and that it would not facilitate appellate review to require further explanation of the path followed by the factfinder in reaching the result." *De Voe v C A Hull, Inc*, 169 Mich App 569, 576; 426 NW2d 709 (1988). Factual findings in a bench trial are sufficient if brief, definite, and pertinent, and it appears that the court was aware of the issues and correctly applied the law such that further explanation is unnecessary. *Triple E Produce Corp v Mastronardi Produce, Ltd*, 209 Mich App 165, 176; 530 NW2d 772 (1995). The court is not required to "comment upon every matter in evidence or declare acceptance or rejection of every proposition argued." *Baker v Baker*, 411 Mich 567, 583; 309 NW2d 532 (1981).

Hard Luck submitted a binder of costs, expenses, and attorney fees. It included a summary of the documentation as well as underlying emails and calendar entries to support the requested fees and costs. Despite this extensive submission, Temperance only contested whether the fees charged for the consultants or experts were necessary for the litigation. George testified that the experts were used to convince the trial court to allow the transfer of the inventory to another licensed warehouse. Hard Luck requested and presented evidence to support substantially more damages than the trial court found. It is apparent that the trial court was aware of the evidence submitted by the parties, and it was not required to comment upon every item submitted, or delineate an acceptance or rejection of each request. *Baker*, 411 Mich at 583. On this record, the trial court's findings were sufficient.

## IV. WAREHOUSE FEES

Temperance next argues the trial court erred in denying its request for warehouse and storage fees under the terms of the parties' contract. This Court reviews de novo a trial court's interpretation of a contract. *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 172; 848 NW2d 95 (2014). The goal of contract construction is to first determine and then enforce the parties' intent. *Harbor Park Market, Inc v Gronda*, 277 Mich App 126, 130; 743 NW2d 585 (2007). When interpreting a contract, the examining court must ascertain the intent of the parties by evaluating the language of the contract in accordance with its plain and ordinary meaning. *In re Egbert R Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008). When the contract language is clear and unambiguous, the contract must be enforced as written. *Id*. A party claiming a breach of contract must establish the existence of a contract, that the other party breached the contract, and that it suffered damages as a result. *Dunn*, 303 Mich App at 774.

Although the courts must enforce unambiguous contractual terms, the freedom to contract allows the parties to enter into new contracts or to modify existing agreements. *Quality Prods & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 370; 666 NW2d 251 (2003). Even if the contract prohibits modification, the freedom to contract will permit modification if it is the product of mutual assent, not unilateral action. *Id*. at 372-373. Thus, the contracting parties may mutually assent to modify a contract, although it contains a written anti-modification or anti-waiver clause. *Id*. Moreover, the parties may enter into an agreement to modify the contract as deduced from their course of conduct "if it is unequivocal and the terms of modification are definite, certain, and intentional." *Detroit Police Officers Ass'n v Detroit*, 452 Mich 339, 345; 551 NW2d 349 (1996). The modification may be by oral or written agreement. *Chatham Super*

*Markets, Inc v Ajax Asphalt Paving, Inc*, 370 Mich 334, 339; 121 NW2d 836 (1963). The party asserting the modification bears the burden of proof. *Dunn*, 303 Mich App at 776. A course of affirmative conduct combined with oral representations may result in the waiver of written contract terms. *Id.* at 777. When the evidence conflicts regarding whether there was a subsequent modification to a parties' agreement, the issue presents a question for the trier of fact. *Case v Bowman*, 265 Mich 106, 107; 251 NW 333 (1933).

The contract referred to Hard Luck as the "customer" and Temperance as the "packer." The contract defined "Warehousing Fee" as "Packer's charge for transporting and storing Beverages, generally charged per Shipping Unit." The section of the contract governing delivery provided for storage and a warehousing charge:

> 10.3 Storage. Unless otherwise expressly provided herein, Packer shall have no obligation to store Beverages for Customer more than thirty (30) days following the latter of the scheduled or actual date of delivery.

> 10.4 Warehousing Charge. In the event that Customer fails to take delivery of the Beverage within the time specified, Packer shall have the right, at its option, to do one or both of the following on reasonable notice to Customer: (i) store the Beverage at Packer's warehouse at the rate(s) listed in the Warehousing Service Exhibit per pallet per month including any portion thereof, or (ii) transport the Beverage to a commercial warehouse for storage under terms and conditions established by the storage provider. The cost of storage shall be due and payable prior to any delivery of the Product to Customer. Packer shall have no liability to Customer for damage to or loss of any Packaged Beverages stored at Packer's production facility or at any commercial warehouse unless caused by Packer, Packer's employees, Packer's agents or subcontractors, or their employees. Warehousing Charges shall be included as a storage fee on the Warehousing Services exhibit.

Additionally, the contract stated that it constituted the entire agreement between the parties:

> 27. ENTIRE AGREEMENT

> This Agreement including its Exhibits sets forth the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings. This Agreement may not be modified except by written amendment signed by both parties. To be effective, any written amendment to this Agreement must be captioned "[sic] Written Amendment to Beverage Production and Packaging Agreement between Temperance Distilling Company and Hard Luck Distributors, LLC."

In the present case, George testified that the contract was negotiated with the Pearsons. Despite the written terms of the agreement, Brian Pearson told George not to worry about the warehouse charges because they would not be charged unless the inventory got out of control. This understanding is supported by the parties' course of conduct. Hard Luck did not receive invoices for monthly warehouse charges. After the contract expired, George testified that the

parties negotiated concerning a new contract, but there were issues with quality control. The parties therefore agreed to continue operating under their prior contract. Consistent with this understanding and the parties' course of conduct, Hard Luck did not receive monthly invoices.

In light of this evidence, the trial court did not clearly err in finding that the parties mutually assented to continue their prior contractual relationship beyond the one-year period, and to be bound by the terms of that agreement. Contrary to Temperance's position, the trial court found that Temperance failed to validly exercise any right to assess warehousing charges. Section 10.4 of the contract provided that Temperance had "the right, at its option to do one or both of the following on reasonable notice to [Hard Luck]: (i) store the Beverage at [Temperance's] warehouse at the rate(s) listed in the Warehousing Service Exhibit per pallet per month including any portion thereof, or (ii) transport the Beverage to a commercial warehouse for storage under terms and conditions established by the storage provider." Regardless of whether Brian Pearson waived the warehouse fees provision, the terms of the contract required Temperance to provide "reasonable notice" to invoke its right to charge the fees.

A condition precedent is a fact or event that the parties agree must occur before there is a right to performance. *Harbor Park Market, Inc*, 277 Mich App at 131. If the condition precedent is unsatisfied, there is no cause of action for a failure to perform the contract. *Id*. The trial court did not clearly err in finding that reasonable notice was never given. Ball admitted that he did not provide notice of the warehouse fees, but asserted that Hard Luck had notice because it was aware of its inventory. However, the plain language of the contract required Temperance to provide notice of the exercise of its option to charge the fee. *In re Egbert R Smith Trust*, 480 Mich at 24. Hard Luck's knowledge that it stored inventory at Temperance's warehouse cannot be equated with knowledge that Temperance intended to exercise its option to charge a fee, especially in light of the parties' prior conduct. Moreover, the trial court found that the warehouse fee charges were fabricated and designed to "strong arm" Hard Luck into signing a new contract. Because Temperance failed to provide notice of its intent to charge warehouse storage fees, the trial court did not err in ruling that it was not entitled to collect the fees.

V. WITNESS LIST

Temperance also argues that the trial court abused its discretion by allowing Hard Luck to call a witness, despite its failure to file a witness list. The trial court's decision whether to permit or bar witness testimony for failure to timely submit a witness list is reviewed for an abuse of discretion. *Duray Dev, LLC v Perrin*, 288 Mich App 143, 162; 792 NW2d 749 (2010). An abuse of discretion standard acknowledges that "there will be circumstances in which there is no single correct outcome; rather, there will be more than one reasonable and principled outcome." *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006) (quotation marks and citation omitted).

Typically, the parties must file a witness list and a trial court may, in its discretion, prevent a party from calling a witness not listed on the list. See MCR 2.401(I)(2). Witness lists are part of discovery, and the objective of pretrial discovery is to make available and disclose all relevant facts in advance of trial. *Grubor Enterprises, Inc v Kortidis*, 201 Mich App 625, 628; 506 NW2d 614 (1993). Witness lists serve the purpose of preventing trial by surprise. *Id*. In *Duray Dev*, this Court explained that a trial court may order the drastic sanction of precluding

-9-

the party from calling witnesses, but it should do so only after careful consideration of the factors involved and its options for a lesser sanction; in doing so, the court should consider:

> (1) whether the violation was wilful or accidental; (2) the party's history of refusing to comply with discovery requests (or refusal to disclose witnesses); (3) the prejudice to the defendant; (4) actual notice to the defendant of the witness and the length of time prior to trial that the defendant received such actual notice; (5) whether there exists a history of plaintiff's engaging in deliberate delay; (6) the degree of compliance by the plaintiff with other provisions of the court's order; (7) an attempt by the plaintiff to timely cure the defect[;] and (8) whether a lesser sanction would better serve the interests of justice. This list should not be considered exhaustive. [*Duray Dev*, 288 Mich App at 165 (quotation marks and citation omitted).]

In the present case, when Temperance filed its witness list, it indicated that it would rely on witnesses named on Hard Luck's "timely filed" list, even though Hard Luck had not filed a witness list. Instead of filing a motion to compel, Temperance waited until the start of trial to object. Additionally, the parties did not appear to engage in discovery, and the posture of the case apparently did not warrant discovery. Indeed, the two key witnesses, George and Ball, had testified at the previous evidentiary hearing on Hard Luck's motion for possession pending judgment. At that hearing, they delineated their positions regarding the interpretation of the parties' contract and the facts and circumstances surrounding the performance of the contract. Hard Luck did not call any witness who was not known to it. The principal issues for the trier of fact involved contract interpretation and credibility determinations. Under the circumstances, the trial court did not abuse its discretion by permitting Hard Luck to call its witnesses.[1]

There were no errors warranting relief. As the prevailing party, Hard Luck may tax its costs. MCR 7.219(A).

Affirmed.

/s/ Kurtis T. Wilder
/s/ Donald S. Owens
/s/ Michael J. Kelly

---

[1] We find no support for Temperance's allegation that the trial court's decision was motivated by its favoritism toward "Macomb County attorneys." Moreover, we note that Temperance did not file a motion to disqualify the trial court on the basis of judicial bias.